# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| Plaintiff | ) | | |
| | ) | | |
| v. | ) | Case No. | 1:22-cr-10157-FDS |
| | ) | | |
| JARMORI BROWN, | ) | | |
| Defendant | ) | | |
| | ) | | |

## DEFENDANT'S SENTENCING MEMORANDUM

Jarmori Brown recognizes that despite being only twenty-one years old, he is at a crossroads in his life. Mr. Brown is before this Court to accept responsibility for his actions. He asks the Court to consider, not only his criminal acts, but also the circumstances that led him to become involved in these acts, his desire to remove himself from these circumstances, and the steps he has already taken to do so.

Mr. Brown was arraigned on this case on August 2, 2022, by way of a habeas corpus *ad prosequendum*. Prior to that date, he had been in state custody on both related and unrelated cases. Following his arraignment on this case, he was returned to state custody. It is anticipated that on July 6, 2023, Mr. Brown will be surrendered into federal custody, at his request, so that he can serve his sentence in this matter. This decision is one which ultimately could expose Mr. Brown to a longer period of incarceration. Mr. Brown nonetheless wishes to be surrendered to federal custody because he knows that his best opportunity for rehabilitation necessitates that he separate himself from the people and environment which previously contributed to the conduct that brings him to this Court. It is anticipated that his state cases will resolve on July 19, 2023, and July 20, 2023, respectively, and that Mr. Brown will receive a total sentence of 2.5 to 3 years in state prison, to be served concurrently to the sentence on this case. Mr. Brown recognizes that

1

being sentenced to a state facility is unlikely to help him rehabilitate himself and is more likely to lead to recidivism. As a result, he has brought himself before this Court to be sentenced on the instant case, and requests that the Court consider all relevant factors, discussed below, to sentence Mr. Brown to sixteen months in federal prison, varying downward from the recommended range to account for his unique situation.[1]

## I.     <u>Applicable Sentencing Guidelines</u>

### a.   <u>The Base Offense Level is 17</u>

USSG § 2K2.1 applies to this case and establishes a base offense level of 12.  *See* USSG § 2K2.1(a); PSR ¶ 29-39; Plea Agreement ¶3.  Two relevant specific offense characteristics are applicable, each of which adds 4 points; the involvement of 8-24 firearms adds 4 points under USSG §2K2.1(b)(1)(B), and USSG §2K2.1(b)(5) adds another 4 points because the offense involves the trafficking of firearms, raising the offense level to 20. Mr. Brown's offense level is reduced by 3 points for acceptance of responsibility, resulting in a total offense level of 17.

### b.   <u>Mr. Brown's Criminal History Category Score</u>

In the plea agreement, the parties agreed that Mr. Brown's Criminal History Category should be calculated as CHC II resulting in a guideline sentencing range of 27-33 months. Mr. Brown has a juvenile delinquency finding that occurred within five years of the offense conduct, which adds two points to his criminal history score and forms the basis for the parties' agreement that CHC II is the correct category under the guidelines.

The PSR recommends placing Mr. Brown in CHC III. The PSR applies USSG § 4A1.1(d) and adds two points to Mr. Brown's criminal history category because Mr. Brown committed the present offense "while under a criminal justice sentence" in DYS custody

---

[1] Depending on the Court's determination of his disputed criminal history score, discussed infra at p. 3-4, the guideline sentencing range for Mr. Brown's sentence is either 27-33 or 30-37 months.

between January 2020 and June 13, 2020. Mr. Brown objects to the additional points added to his criminal history category in the PSR because there is insufficient evidence that he entered the present conspiracy prior to his discharge from DYS custody on June 13, 2020.[2]

Count One alleges that the conspiracy began on January 2, 2020, when Kobe Smith and Jahquel Pringle began communicating over Facebook with Brandon Moore about ordering guns, and continued until around May 21, 2021, when one of the last traceable weapons from the conspiracy was recovered in Boston. Based upon this alleged date range, the PSR determined that Mr. Brown, who was in DYS custody until June 13, 2020, on Dorchester Juvenile Court Docket 18DL0757, had committed the instant offense "while under a criminal justice sentence" and so warranted an additional two points to his criminal history score, bringing him to four points, and level III. *See* PSR ¶44. This conclusion is unsupported by the facts of the case. Mr. Brown did not join the conspiracy prior to June 13, 2020. The case law is clear that an individual defendant is not 'automatically saddled' with the full weight of the criminal conspiracy's wrongdoing but is instead held responsible for crimes bound up in other's actions that were reasonably foreseeable by him and were committed within the scope and in furtherance of the conspiracy. United States v. Garcia, 954 F.2d 12, 15 (1st Cir. 1992). Thus, a sentencing court may consider the actions of co-conspirators prior to a defendant's first participation in the conspiracy by action, but not prior to his agreement to be part of the conspiracy. United States v. Lacroix, 28 F.3d 223, 228 (1st Cir. 1994). The timing of the defendant's entry, or agreement to participate, then is an important factual determination. United States v. Dilema, 886 F. 3d 64, 72-73 (1st Cir. 2018). While the sentencing court may consider evidence at sentencing not

---

[2] The government can point to no evidence of Mr. Brown joining the conspiracy before June 13, 2020, and agrees that CHC II is the proper criminal history category for Mr. Brown.

admissible at a trial under the rules of evidence, the information upon which a court relies must have sufficient indicia of reliability. <u>United States v. Zapata</u>, 589 F.3d 475, 485 (1st Cir. 2009).

In this case, there is an absence of evidence that Mr. Brown entered the conspiracy alleged in Count One prior to his release from DYS custody at a time when he was "under a criminal justice sentence." Count One alleges that in early January 2020, Mr. Moore traveled to Boston to deliver guns. Around this time, he was in communication with Mr. Smith, and the evidence demonstrates that Mr. Moore, Mr. Pringle and Mr. Smith communicated with one another over Facebook for the first six months of 2020.  During this time, Mr. Brown was in DYS custody and there is no evidence connecting him to Mr. Moore's January trip to Boston or any of the communications between Mr. Moore, Mr. Pringle, and Mr. Smith.  Rather, the evidence reflects that Mr. Brown did *not* communicate with his subsequent co-conspirators until he activated a Facebook page roughly two weeks after his release from DYS custody on June 13, 2020. The earliest evidence suggesting Mr. Brown's entry into the conspiracy was in July, after Mr. Pringle returned from his first trip to Alabama.

Because no evidence establishes that Mr. Brown agreed to be part of the conspiracy or participated in any way while he was in DYS custody and thus "under a criminal justice sentence," USSG § 4A1.1(d) should not be applied. Mr. Brown's correct criminal history score is 2, and not 4, as reflected in the plea agreement between the parties. The resulting range should thus be 27-33 months, as previously referenced in the plea agreement, and not 30-37 months.

**II.    <u>Application of 18 U.S.C. 3553(a) Suggests Rehabilitation Should Be the Primary Sentencing Goal in this Case.</u>**

a.    <u>Characteristics of the Offender</u>

Mr. Brown is a twenty-one year-old young man who is the youngest of five siblings. He was born in Alabama and raised in Boston, Massachusetts after his mother moved the family

4

here in 2005. Jarmori's mother, Lula Bell Brown, died from breast cancer in 2009, when he was seven-years old. After her death, Jarmori and his other older brother, Elosko, were taken in and raised by Gloria Walker, his aunt, at her home on Intervale Street in Boston. Jarmori has never known his father. His uncle, Solomon Walker (brother of Gloria Walker), was the closest thing to a father figure that Mr. Brown had in his life. After his mother's death, Jarmori's remaining siblings were separated from him and raised by his uncle James Brown in Lowell, Massachusetts.  Both of those siblings now work in healthcare and have families. Before turning ten years old, Jarmori had been moved to a new city, lost his mother, and been separated from his two older siblings.

Mr. Brown attended elementary and middle school in Boston, but struggled with anxiety and ADHD, for which he was prescribed Adderall and Concerta as a young adult. The prescribed medication did not alleviate his anxiety, and instead caused him side effects such as stomach pain and other physical distress. Gloria Walker describes Mr. Brown as sociable and very family-oriented. While Gloria Walker sent Mr. Brown to grief counseling as a young child, she believes that he never received the help he needed after his mother's death. The passing of his mother, and the subsequent separation from two of his siblings, left Mr. Brown filled with anger and anxiety. He continues to struggle with these emotions to this day.

As a young teenager, Mr. Brown excelled at basketball. He was recruited to play on various teams, including an AAU team. Gloria Walker recalled that Jarmori slept with a basketball on his pillow at this time. His brother, Elosko, who was two years older, was arrested for the first time as a teenager. Around this time, Gloria recalled police officers, clergy and city workers coming to the house to meet with Elosko. Jarmori was determined not to follow his brother into any criminal activity. Unfortunately, by the age of fourteen, Mr. Brown needed

surgery on his knees because of their uneven growth. His basketball career, a productive avenue

for him to direct his energies, was stunted as a result. Mr. Brown began attending Brighton High

School but dropped out during his ninth-grade year.

       After dropping out of high school, Mr. Brown tried to be a productive member of society

and to contribute to his family's financial health.  He worked at ABCD, a non-profit community-

based human services provider, as a counselor in the summers prior to his 18th birthday and

loved the work he did coaching children in his community. He worked more recently, prior to his

incarceration on these cases, for UPS and at Cava, a Mediterranean restaurant in Boston.

       Mr. Brown also spent time with his brother Elosko at ROCA Boston, a youth intervention

program. As previously mentioned, Elosko struggled with many of the same challenges that

Jarmori did. As a result, Elosko was enrolled in ROCA through the court system. Staff at ROCA

recalled Jarmori engaging with the ROCA workers, though he was never formally enrolled as a

program participant, he voluntarily spent time there. Jarmori enjoyed the time he spent with

ROCA, in part because of the structure the program offered – a need that he now acknowledges

was important to his development. Elosko was incarcerated when Jarmori was a teenager,

causing the separation of another sibling.

       Jarmori worked with the Safe and Successful Youth Initiative ("SSYI"), a program run

by City of Boston to direct services to at-risk youths, following his eighteenth birthday, but

struggled to complete the steps necessary to achieve his goals. He was arrested on September 1,

2021, and has been incarcerated since that time, with the exception of one month from

November 2021, to December 2021. During this time, he fell behind with SSYI programming.

More recently, as set forth below, Mr. Brown has re-engaged with SSYI. Jarmori's gravitation

towards ROCA and later SSYI both demonstrate his desire to develop positive influences and

structure in his life. As a child, he sought out the opportunity he saw in these programs, but ultimately was derailed by the other challenges and influences in his life. He was raised without a mother, without a father, and with a brother who, in Jarmori's formative years began engaging in criminal activity. While Gloria Walker served as a guardian to Elosko and Jarmori, she had her own child to parent, and worked to support not only her own child and herself, but also Jarmori and Elosko. Elosko Brown completed his state sentence and is now fully employed as a plumber and living independently. Elosko's story is one of successful rehabilitation, and Jarmori is committed to following it.

Significantly, in the time-period leading up to, and during the crimes charged before this court, the Brown family suffered two deaths in the period of three weeks in the spring of 2020. Both deaths significantly affected Mr. Brown. In March of 2020, Jarmori lost his aunt Cynthia Walker and within weeks he lost his uncle Solomon Walker. As noted above, Solomon Walker was the closest thing to a father that Mr. Brown had. Mr. Brown was unable to attend the funerals of both relatives because he was in DYS custody at the time. To cope with these losses, in addition to the losses he had already suffered in his life, Mr. Brown turned to alcohol as soon as he was released, a substance that prior to his release from DYS, Mr. Brown had not abused. In the period following his release from DYS custody on June 13, 2020, Mr. Brown abused alcohol daily. He characterizes the time between his release from DYS and his eventual incarceration in September 2021 as a blur.

As a result of his pre-trial incarceration, Mr. Brown has stopped drinking and has been able to consider his past with a clear mind. His time awaiting trial has provided him with the opportunity to understand how personal loss and his efforts to cope contributed to choices that he deeply regrets. Mr. Brown is a young man who has been confronted with losses and challenges

typically encountered by a person twice his age. Despite having the good fortune to have his aunt

take him in, Mr. Brown as a child had the responsibility of building for himself the structure and

mechanisms necessary to navigate the enormous challenges posed in his young life. His

gravitation to programs that provide structure, from organized basketball to SSYI, is evidence of

his early unsuccessful efforts to develop positive momentum in his life. Unfortunately, he was

unsuccessful in completing the work he started.

           b.   Nature and Circumstances of the Offense

Mr. Brown pleaded guilty to one count of conspiring to illegally transport or receive

firearms and one count of illegal transportation or receipt of a firearm, in violation of 18 U.S.C.

922(a)(3). Mr. Brown transported firearms from Alabama to Massachusetts in August of 2020.

His companion on that trip, Mr. Pringle, had previously transported firearms from Alabama to

Massachusetts in July 2020, and Mr. Brown later received one of those firearms in

Massachusetts on or before December 13, 2020. His arrest for possessing that firearm on

December 13, 2020, resulted in charges in the Dorchester Division of the Boston Municipal

Court that are still pending and are expected to resolve on July 20, 2023.[3]

Mr. Brown understands that the offenses he committed are serious. Firearm violence is a

significant problem in the City of Boston and Mr. Brown recognizes the negative impact his

actions and others like them have had on his community. In this case, however, Mr. Brown's

actions reflect a profound need for structure and direction in his life.

When Mr. Brown was released from DYS custody on June 13, 2020, he returned to

Gloria Walker's home. Within weeks, he had re-connected with old acquintances who were

---

[3] Mr. Brown faces one related and two unrelated state cases in Suffolk County. Counsel in this case has coordinated
with counsel on the state cases, William Sprouse, and with the Suffolk County District Attorney's Office regarding
the disposition of the state cases, scheduled to take place on July 19, 2023, and July 20, 2023, *see* p. 13 infra.

engaged, at that time, in a firearm trafficking conspiracy. Both of Mr. Brown's co-conspirators arranged to purchase firearms in Alabama. One of Mr. Brown's co-conspirators, Pringle, made a trip in July, then scheduled a second trip in August. Pringle purchased bus tickets for himself, and for Mr. Brown, and Mr. Brown accompanied Pringle to Alabama in August 2020. In so doing, he joined the ongoing criminal conspiracy for which he recognizes that he must be punished.

But these facts also demonstrate that Mr. Brown drifted into criminal activity that he did not direct or design. In this way, he is the least culpable of the co-conspirators and illustrates Mr. Brown's pattern of failing to develop positive relationships in his life, and his drifting into criminal activity as a result.  In the context of the overall conspiracy, Mr. Brown's primary role was limited to a one-week trip; after that, he was more akin to a purchaser than a trafficking co-conspirator. In contrast, Mr. Brown's two co-defendants maintained contact with Mr. Moore for an extended period of time to order weapons and coordinate two transfers, one in January 2020 and again over the summer of 2020. Mr. Brown communicated with Mr. Moore only once following his August 2020 trip, and there is no evidence that he ever conducted another transfer of firearms. His two co-defendants, did engage in a continuing pattern of weapons transfers. Mr. Brown's role was limited to a far narrower window of time.

The Court can and should consider these differences in participation when determining a sentence that is sufficient but not greater than necessary to satisfy the purposes of punishment in Mr. Brown's case, particularly when weighed against his ability to receive the rehabilitative support he needs. Since his arrest, Mr. Brown has engaged in programming and begun developing a plan for his release specifically designed to remove himself from the environment and people with which he was previously engaged. Counsel suggests that Mr. Brown's more

limited role in the conspiracy reflects that the crimes for which he has pleaded guilty were mistakes made during a tumultuous and difficult time in his life, and not indications of a commitment to criminality.

c.  <u>Mr. Brown's Proposed Sentence Best Serves the Purposes of Rehabilitation and Successful Reentry.</u>

In this case, the primary purpose of Mr. Brown's sentence should be to provide him with the structure needed to facilitate his rehabilitation and successful reentry into society. The defendant is twenty-one years old. He has lacked consistent structure and support throughout his life. To date, his most productive and successful periods have resulted from externally provided structure. His acknowledgment of the benefits of structure in his life, and his desire for external supports, are telling. Mr. Brown is accountable for his crimes and hopes to be accountable to himself and his family in the future. Further, Mr. Brown recognizes the changes in his life he must make to create a better life for himself.

Mr. Brown takes full responsibility for his past choices and his future success and has already begun to establish the support structures that will aid his transition back to a law-abiding life upon his release. Most significantly, while incarcerated, Mr. Brown has been working with the Safe and Successful Youth Initiative ("SSYI"), a program run by City of Boston to direct services to at-risk youths. SSYI is funded by the Commonwealth of Massachusetts Executive Office of Health and Human Services through its Division of Violence Prevention and designed to provide outreach and intensive engagement to young individuals, ages 17-24, involved in the justice system. In its more than ten years of existence, SSYI has engaged and served over 900 young people by offering their clients a "developmental partnership," a relationship with SSYI that offers support but also provides structure through compliance. SSYI assists in performing an assessment of needs, designing a re-entry plan, creating a service plan and coordination of

10

services, supporting each individual's efforts to achieve their own self-identified goals, and assisting with keeping participants in compliance with the terms and conditions of community supervision.

SSYI offers employment services and occupational training, educational services, and behavioral health services, all of which Mr. Brown needs. He has been working with SSYI coordinator Allyson Boehler to begin developing his goals and service plan, which will take into account Mr. Brown's desire to remove himself from Boston, following in the footsteps of his older brother and sister. With Ms. Boehler's help, Mr. Brown has begun the process of setting up gainful employment with his brother Elosko's employer, the owner of a plumbing company, and he has been working with Ms. Boehler to identify training that will enable him to enter that profession.  In addition, Mr. Brown has completed several courses that will help provide him with the training and skills to successfully re-enter the workforce, including Anger Management, Alive and Free, Men's Health, and Essential Workplace Skills training, and is currently working to complete his GED.

 Clearly, Mr. Brown is benefiting from the support and resources that SSYI provides. However, if his release date is more than thirty months from his sentencing date, Mr. Brown will be unenrolled, and will need to attempt to re-enroll, if still eligible at a later date. If his release date is more than thirty-five months from his sentencing date, Mr. Brown will likely have aged out of the program by his release date and will not be eligible for SSYI's re-entry assistance.  Mr. Brown's requested sentence would enable him to continue to work with the SSYI people and

supports he has come to know and trust while he is transitioning from prison, which will serve

both his interest in rehabilitation and society's interest in reducing the risk of recidivism.[4]

> d.  The Proposed Term of Incarceration, While Significant, Is Not Greater
>     than Necessary to Satisfy the Purposes of Punishment.

This crime is the most significant felony charge Mr. Brown has faced in his life. He has

now been in custody for roughly twenty months on the Suffolk Superior Court cases and has

spent eleven months in custody since his arraignment in this case. This period of incarceration is

significantly longer than his prior DYS incarceration and has provided him with the opportunity

to reflect on his circumstances.  Mr. Brown understands the import and grave significance of his

conviction and has taken every step he can to accept responsibility and make amends. Simply

put, Mr. Brown is at a crossroads in his young life, a fact of which he is keenly aware.

His desire to appear before this court as a federal prisoner is evidence of that. Being

sentenced as a prisoner of the Commonwealth of Massachusetts provided Mr. Brown with an

avenue to a shorter period of incarceration. Mr. Brown, however, aware that incarceration in a

state facility would cause him to fall behind on programming and likely increase his

entanglements with individuals from the City of Boston, is instead before this Court, seeking this

court to impose a federal sentence.  Mr. Brown is aware that even though his punishment may be

---

[4] SSYI has a proven track record of success; one study found that individuals who were eligible for but not enrolled with SSYI were twice as likely to be incarcerated as those who were enrolled, according to SSYI's 2023 legislative report and the evaluation performed by American Institutes for Research.  *See Campie, Patricia E., Mary Vriniotis, Nicholas W. Read, Trevor Fronius, and Anthony Petrosino. A Comparative Study Using Propernsity Score Matching to Predict Incarceration Likelihoods Among SSYI and non SSYI Youth from 2011-2013. Boston, MA: Massachusetts Executive Office of Health and Human Services, 2014.*  That same legislative report reflects a statistically significant association between increased contact with the program and decreased recidivism.  *See Campie, Patricia E., Nicholas W. Read, Trevor Fronius, Allyson Pakstis, Victoria Rothbard, and Anais Toungui. Understanding the Influence of Outreach, Case Management, and Service Engagement on Client Outcomes in the Safe and Successful Youth Initiative. Boston, MA.: Massachusetts Executive Office of Health and Human Services, 2014*

greater, this may nonetheless be the best opportunity he has to reform himself and successfully

rejoin society.  A sentence of 16 months will serve the purposes of specific and general

deterrence, while also facilitating Mr. Browns successful re-entry at the end of it because he will

still be eligible to receive support from SSYI.

### III.    Mr. Brown's Proposed Sentence Will Satisfy His Anticipated Dispositions in State Court While Also Providing Sufficient Punishment and a Pathway for Successful Reentry.

Mr. Brown is charged with attempted assault and battery by means of discharging a

firearm on Docket 2284CR00215, and possession of a firearm, second offense, possession of

ammunition, carrying a loaded firearm, and assault and battery on a household or family member

on Docket 2184CR00750, all stemming from events that occurred on September 1, 2021. *See* P.

48 and 49 of PSR. He was held without bail initially and later on $5000 bail on these cases. He is

charged with accessory after the fact on Docket 2284CR00071, stemming from an incident that

occurred on August 29, 2021. *See* ¶50 of PSR.

These cases are scheduled for disposition on July 19, 2023, in Suffolk Superior Court.

Based on conversations with counsel on the state case, with the Suffolk County District

Attorney's Office and their representations of conferences with the court there, it is anticipated

that Mr. Brown will plead guilty and be sentenced to 2.5 years to 3 years state prison on Docket

2184CR00750; with sentences of 2.5 years state prison, deemed served running concurrent to the

primary sentence. One of the charges to which Mr. Brown will plead guilty and be sentenced on

Docket 2184CR00750, possession of a firearm, not at home or work, M.G.L. c. 269 s. 10(a),

carries a two and half year mandatory minimum sentence in state prison, or alternatively a

mandatory minimum of eighteen months in the house of correction. Mr. Brown also faces

charges for possession of a firearm, not at home or work, in Dorchester Court on Docket

2007CR003714, for charges stemming from his possession of the December 13, 2020 gun, a charge related to the instant case. The same mandatory minimum provisions apply to this charge. Mr. Brown will be brought into Dorchester Court on July 20, 2023, to plead guilty and be sentenced to eighteen months in the house of correction, to run concurrent with the primary sentence on 2184CR00750. It is anticipated that all of the state charges will run concurrent to this Court's sentence. Mr. Brown will still need to complete between nine and fifteen months in custody to complete his state sentences.

Mr. Brown had been held in state custody on a total of $6,025.00 bail, spread over three cases, for more than twenty months on the state cases. Following his indictment and arraignment in federal court in August of 2022, Mr. Brown declined to post that bail because of the likelihood of federal detention. But because Mr. Brown was arrested and held on bail first by the state, then transported into Federal Court by a habeas corpus *ad prosequendum* to be arraigned on this case, the Commonwealth of Massachusetts became the "primary sovereign" and retained primary jurisdiction. With Massachusetts as the primary sovereign in the case, Mr. Brown's state sentence out of Suffolk Superior Court would serve as the primary sentence in this case, and his federal sentence could appropriately be run concurrent to his sentence to state prison. United States v. Setser, 566 U.S. 231 (2012); United States v. Whitmore, 700 F. 3d 570 (1st Cir. 2012); USSG 5G3.1(a-c). The operation of 5G3.1 in cases where the two sentences should overlap and run concurrent, at least in part, serves to mitigate against the possibility that the two separate prosecutions will grossly increase a defendant's sentence. Witte v. United States, 515 U.S. 389 (1995).

As a result, Mr. Brown's best opportunity to limit his time in custody would have been to remain in state custody, with Massachusetts as the primary sovereign. Instead, Mr. Brown sought

to get himself into federal custody because he recognizes that the federal conviction and sentence on this case is the most significant event of his young life, and that the only way that this time in custody will result in a positive change is if it serves to separate him from his prior associates and pattern of conduct. The Commonwealth of Massachusetts agreed with this position, reducing his bail on the two Superior Court cases and relinquishing him into federal custody. The switch in sovereignty provides Mr. Brown with the best opportunity to rehabilitate himself. It better reflects the seriousness of the offenses and charges and is expected to result in the state sentences being run concurrent with the sentence on this case.

This design, however, makes it extremely unlikely that Mr. Brown will be entitled to any credit for the time he has been held on bail in state custody, with the threat of federal detention looming over him on this case. United States v. Mills, 501 F.3d 9, 11 (1st Cir. 2007); Sinito v. Kindt, 954 F.2d 467, 470 (7th Cir. 1992). Under 18 U.S.C. s 3585(b), a defendant will be provided credit for time spent in official detention prior to the commencement of the sentence 1) as a result of the offense for which the sentence was imposed; or 2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence has been imposed, that has not been credited against another sentence. In the instant case, Mr. Brown, who was brought into federal court "on loan" by means of a habeas corpus *ad prosequendum*, will be not receive credit for his time "on loan" despite having been in custody eleven months since his first appearance in this court on August 2, 2022. United States v. Cole, 416 F. 3d 894 (8th Cir. 2005).

The time Mr. Brown has spent in custody, including the eleven months dating back to the initiation of the federal case will thus be credited towards his state court sentences. Mr. Brown will not receive "double credit" for the time spent in custody since August 2, 2022, as a result of

his decision not to raise or post bail on the state cases. <u>United States v. Wilson</u>, 503 U.S. 329 (1992). By the time the Bureau of Prisons calculates his credit, Mr. Brown will have none, all of his days in custody having been directed towards the state sentence. The guidelines and existing case law recognize the court has discretion in complex situations to fashion a sentence of appropriate length to achieve a reasonable punishment. *See* USSG 5G3.1. Properly applied, 5G3.1 approximates the total punishment that would have been imposed had all the offenses been federal offenses for which sentences were being imposed at the same time. <u>Prewitt v. United States</u>, 83 F. 812 (7th Cir. 1996).  Thus, the court can take into account the time Mr. Brown has spent in custody up to this point in departing downwards slightly in its sentence to reduce the likelihood that Mr. Brown be disproportionately punished for his decision to be surrendered to the federal sovereign.

In this case, a sentence of sixteen months would take account of the eleven months for which Mr. Brown will likely not receive credit but has spent incarcerated. It would also result in Mr. Brown, who has been in custody since December 9, 2021, ultimately spending thirty-seven months incarcerated total, which appropriately approximates the median sentence other offenders have received for this charge.  It would take into account pertinent considerations under 18 U.S.C. s. 3553(a), reflecting the seriousness of the offense, but also provide Mr. Brown with the opportunity to rehabilitate himself into a productive member of society, which, given his age, his attributes, and his commitment, he has a strong chance of doing. A sentence of sixteen months would serve as an appropriate deterrent, demonstrating the seriousness of the offense committed by Mr. Brown, properly calibrated to reflect his role in the conspiracy.  And it would permit him to re-enter society with SSYI's assistance, significantly reducing his likelihood of recidivism and allowing him to continue the programming that he has already begun.

## CONCLUSION

For the foregoing reasons, and those to be articulated at the sentencing hearing, the defendant respectfully requests that this Court impose a sentence of sixteen months imprisonment, followed by a term of supervised release.

Respectfully submitted,

 /s/ William Kettlewell_____
William H. Kettlewell (BBO #270320)
SILVA, KETTLEWELL & PIGNATELLI LLC
10 High Street, Suite 505
Boston, MA 02110

 /s/ William Andrew Kettlewell_____
William A. Kettlewell (BBO #682929)
SILVA, KETTLEWELL & PIGNATELLI LLC
10 High Street, Suite 505
Boston, MA 02110

*Counsel for Defendant, Jarmori Brown*

Dated: July 5, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Respectfully submitted,

 /s/ William Kettlewell_____
William H. Kettlewell (BBO #)
*Counsel for Defendant, Jarmori Brown*

Dated: July 5, 2023